**IN THE COURT OF APPEALS OF IOWA**

No. 23-1686
Filed January 24, 2024

**IN THE INTEREST OF F.H., W.H., and B.H.,**
**Minor Children,**

**M.M., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt, Judge.

A mother appeals the order terminating her parental rights to three children. **AFFIRMED IN PART AND VACATED IN PART.**

Jamie L. Schroeder of Nelson & Toenjes PLLC, Shell Rock, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Michele R. McCann of McCann Law, PLLC, Cedar Falls, guardian ad litem for minor children.

Tammy Banning of Juvenile Public Defender's Office, Waterloo, attorney for minor children.

Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**TABOR, Presiding Judge.**

This case involves three children: thirteen-year-old F.H., ten-year-old W.H., and nine-year-old B.H. These siblings have suffered "a lot of trauma" and act out as a result. According to their caseworker, when they're around their mother their defiance "just explodes. Almost like you put gas on top of the fire and then the behaviors just escalate pretty severely." Rather than correct their behaviors, the mother lets the children "just do whatever they want."

Citing the mother's lack of parenting skills, as well as her failure to address her substance use and mental health, the juvenile court terminated her parental rights to the three children. The mother, Maggie, appeals raising five claims: (1) the State did not prove grounds for termination; (2) termination was not in the children's best interests; (3) exceptions apply because of their bonds and the children's objection to termination; (4) she should have more time for reunification; and (5) the juvenile court erred in ordering her to repay her court-appointed attorney fees. We affirm on all but the last issue.[1]

I. **Facts and Prior Proceedings**

In December 2021, the father had sole custody of F.H., W.H., and B.H. But he allowed them to live with Maggie. While caring for them, Maggie was using methamphetamine.[2] She also went to jail on drug charges. During her incarceration, the children lived with Maggie's twenty-year-old son and his

---

[1] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). The juvenile court's fact findings carry weight but are not binding. *Id.* Our priority is the children's best interests. *Id.*

[2] It was not the first time. In 2018 and 2019, child protective services issued founded reports that she had been high on methamphetamine when supervising her children.

girlfriend under a voluntary safety plan developed by the Iowa Department of Health and Human Services.

The department provided services to the children and that placement. But not Maggie. After she left jail, she did not respond to the case worker's outreach for seven months. The court adjudicated F.H., W.H., and B.H. as children in need of assistance (CINA) in May 2022.[3] Following the adjudication, the children struggled in their brother's home. He would let Maggie take the children without supervision. And the children were left alone for days at a time. So the department moved them to new placements.[4]

Meanwhile, Maggie did not meet the expectations of the department's case plan. She often showed up late for visits or did not show up at all. Her inconsistency affected the children: "they get pretty frustrated or angry because they're looking forward to seeing their mom and will get upset, cry, come back to foster home upset." Some of the difficulty in scheduling visits stemmed from her work schedule: "Maggie has had a number of different jobs so about the time we get the schedule going, she takes on another job and it changes again."[5]

When Maggie did attend supervised visits, she could not control the children, who would "just run around and do whatever they want. They are not really ever told no or disciplined." The case worker also noted that the mother did

---

[3] F.H. accused her father of sexual abusing her. The child abuse assessment was unfounded. But according to the case worker, the father did not want the children back in his care because he believed that they had made false accusations of abuse against him.

[4] At the time of the termination hearing, the siblings had three separate placements. W.H. was living with an aunt, B.H. was in foster care, and F.H. was in a qualified residential treatment program (QRTP).

[5] Maggie has worked in restaurants, either serving food or in the kitchen.

not seek a mental-health evaluation or treatment for herself. Without that engagement, the case worker believed it would be "very difficult to start addressing the parent education and helping her with her kids and all of their trauma."

And despite long-standing concerns about her methamphetamine use, the mother was slow to obtain a substance-use evaluation and did not follow through with the recommended treatment. Neither did she participate in drug testing as required in the CINA case. But as part of her criminal probation, she provided a urine sample positive for methamphetamine in April 2023.

The State petitioned for termination of parental rights in July 2023. At the August 2023 termination hearing, the State offered testimony from the department's case worker. The mother attended but did not testify. Her attorney offered an exhibit from a drug counselor who reported that Maggie's screening revealed a moderate amphetamine-type substance-use disorder.

The children's representation was bifurcated between an attorney and their guardian ad litem (GAL). Their attorney told the court that W.H. and F.H. opposed termination and believed that they could be safely returned to their mother's care. B.H. had a slightly different take: "In a perfect world he has always wanted to return to his mother's care." But he declined to express a preference for placement and asked the court to decide for him. The GAL believed termination was in the children's best interests, finding no evidence in the record that Maggie could offer them a stable environment.

In its September order, the juvenile court terminated Maggie's parental rights under Iowa Code section 232.116(1) (2023), paragraphs (e), (f), and (l). The court rejected her argument that termination would harm the children because of

the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(c). Maggie appeals.

## II. Analysis

Most often we analyze termination cases in three steps. *In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2018). First, we look for a basis to terminate in Iowa Code section 232.116(1). *Id.* Second, we decide whether termination is in the children's best interests under the framework of section 232.116(2). *Id.* Third, we consider whether we should apply any of the permissive factors in section 232.116(3). We examine all three steps here.

### A. Statutory Grounds for Termination

The State must prove the grounds for termination by clear and convincing evidence. *L.B.*, 970 N.W.2d at 313. "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). In this case, we focus on paragraph (f), which requires proof that (1) the children are four or older; (2) they have been adjudicated as CINA; (3) they have been removed from home for the last twelve straight months; and (4) they cannot be returned to the parent's care at the present time. Iowa Code § 232.116(1)(f).

Maggie challenges only the fourth element. She contends that she could resume care of the children given her "sobriety, stable housing and employment, and significant relationships with her children." We disagree.[6] Maggie had not

---

[6] Our case law offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102 (discussing transfer

6

sought treatment for her substance-use disorder.  Nor had she addressed her mental health.  She was inconsistent in her visits with the children and did not even try to control their unruly behavior.  In the last few months of the CINA case, Maggie was living with her adult daughter.  But her bedroom was the living room.  And the caseworker did not believe there was space to accommodate all three children should they return home.  This record contains clear and convincing evidence that the children could not safely be returned to Maggie's custody at the time of the termination hearing.  *See In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016).

### B.  Best Interests

Moving to best interests, we give primary consideration to the children's safety; to the best placement for furthering their long-term nurturing and growth; and to their physical, mental, and emotional condition and needs.  Iowa Code § 232.116(2).  We also consider whether they are integrated into a foster home, and their placement preferences, when they can express them.  *Id.* § 232.116(2)(b).  The best-interests determination also embraces the concept of permanency.  *See In re W.M.*, 957 N.W.2d 305, 313–14 (Iowa 2021) (reiterating

---

of a child's legal custody if staying in the home would be "contrary to the welfare of the child").  Many cases cite *In re M.M.*, 483 N.W.2d 812, 815 (Iowa 1992), which quotes section 232.102(4)(a)(2)—then numbered section 232.102(5)(b)—for the proposition that custody should be transferred only if the court finds "the child cannot be protected from some harm which would justify adjudication of the child as a child in need of assistance and an adequate placement is available."  *See, e.g., In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016).  But our supreme court often describes that element as the inability to "safely return" children to their parents' care.  *See, e.g., In re T.W.*, No. 20-145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases).  Under either formulation, the State met its burden of proof.

that children should not be deprived of permanency "by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child").

Maggie emphasizes on appeal that all three children are in separate placements, none of which offered a clear plan for permanency. She points particularly to F.H.'s prospects: "Her placement in QRTP meant that she would not be in a home or family-like setting and, therefore, not eligible for adoption." Maggie also stresses that W.H. and F.H. objected to termination and wanted to return to her care. Maggie's points are well taken. Long-term permanency is not in their sights, and the children wish they could go home.

Yet termination remains in their best interests. As the case worker explained at the hearing, "these kids have significant behaviors and trauma from the experience they have suffered in the hands of their parents," and Maggie doesn't have the parenting skills to help them navigate their emotional conditions. According to their GAL, the boys—W.H. and B.H.—have "thrived in their foster care homes" where all their needs are being met. As for F.H., she now "is in an environment where she can get the treatment she needs." Their court appointed special advocate (CASA) also believed termination was in their best interests: "the long process has been difficult for the kids. The up and down, and not knowing, has been difficult. And I would think it would be in their best interest to have the termination sooner rather than later." While no doubt painful, termination is the best option for these children.

### C. Statutory Factors Weighing Against Termination

Maggie next argues that paragraphs (b), (c), and (d) of section 232.116(3) are relevant to our analysis. Under those provisions, a court may preserve the parent-child relationship if it finds:

> (b) The child is over ten years of age and objects to the termination.
> (c) There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.
> (d) It is necessary to place the child in a hospital, facility, or institution for care and treatment and the continuation of the parent-child relationship is not preventing a permanent family placement for the child. . . . .

Iowa Code § 232.116(3).

As for (b), only F.H. was over ten years old. True, she opposed termination. But her GAL and CASA explained why it was best for her well-being. While we respect F.H.'s view, "we do not believe this permissive factor required the juvenile court to bypass termination in this situation." *In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019). F.H. has struggled with her behaviors and mental-health issues; her desire to reunify with her mother is not a realistic prospect.

As for (c), the children's attorney argued that the children felt "very close to their mother." The CASA also reported that the children were "strongly bonded" to their mother. "We do not discount that there is a bond between [Maggie and her children]. But [she] has failed to provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not." *W.M.*, 957 N.W.2d at 315. And the case worker's comparison of Maggie's visitation with the children to throwing gasoline on a fire leads us to believe that termination is the less harmful option.

As for (d), Maggie maintains placement of F.H. in the QRTP facility means that continuation of the parent-child relationship does not prevent a permanent family placement for that child.[7] That rationale may apply in the short term. But as the GAL explained, in the long term, severing parental rights will ensure that the children are "freed for adoption." Terminating Maggie's parental rights allows the department to seek an adoptive placement for F.H. upon her release. *See In re J.R. II*, No. 12-1239, 2012 WL 4903048, at *3 (Iowa Ct. App. Oct. 17, 2012).

None of the section 232.116(3) factors block termination.

### D. More Time to Reunify

As a final means to avoid termination, Maggie asks for six more months to work toward reunification. *See* Iowa Code § 232.104(2)(b). She asserts that her situation "greatly improved" in the months just before the termination trial and a little extra time will get her over the finish line. She declares that she is "willing to continue working" with the department and other professionals to "further prove" that the children can be safely returned to her care.

A court may deny termination and give a parent more time for reunification only if the need for removal "will no longer exist at the end of the additional six-month period." *Id.* And not only must the record show that Maggie has overcome the obstacles to reunification in six months, but we must consider whether the delay is in the children's best interests. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021). Because Maggie's methamphetamine use while caring for the

---

[7] The State's response to the petition on appeal fails to address this argument. Likewise, the juvenile court order does not mention paragraph (d), though it was raised at trial. We opt to bypass any error-preservation problem and address the merits of this claim.

children sparked the department's intervention, and she has not started treatment for her substance-use disorder, we do not find that another six months would ensure safe parenting. She had eighteen months to take the necessary steps to be a successful parent but did not do so. More time is unwarranted.

### E. Reasonable Ability to Pay Attorney Fees

In March 2022, Maggie applied for court-appointed counsel and swore in an affidavit that she was making $10 per hour at a pizzeria in Waterloo. The court approved her request for the CINA case, finding that Maggie was eligible for court-appointed counsel under Iowa Code section 815.9 because her income was "at or below 125% of the poverty guidelines." In July 2023, the court reappointed counsel for the termination proceedings. The order stated: "Per Iowa Code section 815.9, you may be required to reimburse the State for all or a portion of the attorney's fees and costs."

In its termination order, the juvenile court stated: "[Maggie] claims to be gainfully employed and as such shall be responsible for her attorney fees." In her petition on appeal, Maggie challenges that order to repay attorney fees. In its response, the State "offers no argument as to the question of attorney's fees and the finding of the juvenile court."

Iowa Code section 815.9 governs the appointment of counsel to indigent persons and applies to court appointments under chapter 232. Iowa Code § 815.9(1).

Subsection (6) addresses repayment:

If the person receiving legal assistance . . . is a party in a case other than a criminal case, the court shall order the payment of all or a portion of the total costs and fees incurred for legal assistance, to the

> extent the person is reasonably able to pay, after an inquiry which includes notice and reasonable opportunity to be heard.

*Id.* § 815.9(6); *accord State v. West Vangen*, 975 N.W.2d 344, 352 (Iowa 2022) (recognizing provision found unconstitutional as to acquitted defendants in *State v. Dudley*, 766 N.W.2d 606, 614 (Iowa 2009)). The language of the statute is clear: the juvenile court is to make an inquiry, "which includes notice and reasonable opportunity to be heard" before assessing costs against a parent. That did not happen here. The court did not give Maggie notice or ask about her reasonable ability to pay. And Maggie asserts on appeal that "[w]hile [she] is employed in the restaurant industry, her limited income does not allow her to reasonably pay the entirety of her court-appointed attorney fees." Because the juvenile court did not comply with section 815.9(6), we vacate its part of the order assessing attorney fees.

We affirm the rest of the termination order.

**AFFIRMED IN PART AND VACATED IN PART.**